SOLICITATION VERSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>JER Investors Trust Inc. *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 23-12109 (TMH)<br><br>(Jointly Administered) |

## DEBTORS' MODIFIED COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLAN

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
Tori L. Remington (DE No. 6901)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 777-6500
Email:  david.fournier@troutman.com
       kenneth.listwak@troutman.com
       tori.remington@troutman.com

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Deborah Kovsky-Apap (admitted *pro hac vice*)
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
Email: deborah.kovsky@troutman.com

*Counsel to the Debtors and Debtors in Possession*

Dated: March 28, 2024

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: JER Investors Trust Inc. (2779) and JERIT Non-CDO CMBS 1 LLC (0778). The notice address for each Debtor is Ten Bank Street, Suite 1100, White Plains, New York 10606.

## **DISCLAIMER**

THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PROPONENTS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED PLAN AND DISCLOSURE STATEMENT OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE PROPONENTS OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b), AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS.

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT PROVIDES FOR SUBSTANTIVE CONSOLIDATION OF THE ASSETS AND LIABILITIES OF THE DEBTORS.**

SEE ARTICLE IX HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

**THE DEBTORS SUPPORT CONFIRMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AND RECOMMEND ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

## TABLE OF CONTENTS

I INTRODUCTION ........................................................................................................... 1

II DEFINITIONS, COMPUTATION OF TIME, AND GOVERNING LAW ........................................ 1

A. Defined Terms............................................................................................................... 1

A. Rules of Interpretation ................................................................................................. 10

C. Computation of Time ................................................................................................... 10

D. Governing Law ............................................................................................................ 10

E. Reference to Monetary Figures ................................................................................... 11

F. Controlling Document .................................................................................................. 11

III BACKGROUND AND DISCLOSURES ............................................................................ 11

 3.1. The Debtors' General Background ......................................................................... 11

 3.2. The Junior Subordinated Notes............................................................................. 13

 3.3. The 2011 Transaction ............................................................................................ 13

 3.4. Events Leading to Chapter 11 ................................................................................ 14

 3.5. The C-III Settlement ............................................................................................... 14

 3.6. The Chapter 11 Cases ............................................................................................ 15

IV ADMINISTRATIVE AND PRIORITY CLAIMS ................................................................. 16

 4.1. Administrative Claims ............................................................................................ 16

 4.2. Professional Compensation.................................................................................... 17

 4.3. Priority Tax Claims................................................................................................ 18

 4.4. U.S. Trustee Statutory Fees.................................................................................... 18

V CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS..................................... 18

 5.1. Summary of Classifications ................................................................................... 18

 5.2. Treatment of Classes of Claims and Interests ....................................................... 20

 5.3. Special Provision Governing Unimpaired Claims ................................................ 22

 5.4. Elimination of Vacant Classes .............................................................................. 22

 5.5. Controversy Concerning Impairment..................................................................... 22

 5.6. Subordinated Claims .............................................................................................. 22

VI CONFIRMATION AND VOTING PROCEDURES ............................................................... 23

 6.1. Confirmation Procedure ......................................................................................... 23

 6.2. Procedure for Objections ....................................................................................... 23

 6.3. Requirements for Confirmation ............................................................................. 23

 6.4. Classification of Claims and Interests.................................................................... 23

 6.5. Impaired Claims or Interests .................................................................................. 24

 6.6. Voting Classes; Presumed Acceptance by Non-Voting Classes............................ 25

 6.7. Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code ................... 25

6.8. Feasibility ..................................................................................................... 26

6.9. Best Interests Test and Liquidation Analysis ................................................ 26

VII    MEANS FOR IMPLEMENTATION OF THE PLAN .................................... 27

7.1. Substantive Consolidation of the Debtors ..................................................... 27

7.2. Vesting of Assets and Sources of Consideration for Plan Distributions ........ 27

7.3. Corporate Action ........................................................................................... 27

7.4. Plan Administrator ......................................................................................... 27

7.5. Closing the Chapter 11 Cases and Wind Down of the Debtors and Their Non-Debtor Subsidiaries ................................................................................................................. 28

VIII    TREATMENT OF EXECUTORY CONTRACTS ........................................ 29

8.1. Assumption and Assignment of Executory Contracts. .................................. 29

8.2. Cure of Defaults for Assumed Executory Contracts ..................................... 30

8.3. Claims Based on Rejection of Executory Contracts ...................................... 30

8.4. Insurance Policies .......................................................................................... 31

8.5. Indemnification Obligations .......................................................................... 31

8.6. Reservation of Rights ..................................................................................... 32

IX    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ............... 32

9.1. The Plan May Not Be Accepted .................................................................... 32

9.2. The Plan May Not Be Confirmed .................................................................. 32

9.3. Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections ................................................................................................................. 33

9.4. Objections to Classification of Claims ........................................................... 33

9.5. Failure to Consummate the Plan .................................................................... 33

X    Certain Tax Considerations ............................................................................. 34

XI    PROVISIONS GOVERNING DISTRIBUTIONS ...................................... 34

11.1. Calculation of Amounts to Be Distributed ................................................... 34

11.2. Disputed Claims Reserve ............................................................................. 34

11.3. Interest and Penalties on Claims .................................................................. 35

11.4. Delivery of Distributions and Undeliverable, Unclaimed or Forfeited Distributions ............ 35

11.5. Compliance with Tax Requirements; Allocations ......................................... 37

11.6. Setoff ........................................................................................................... 37

11.7. Claims Paid or Payable by Third Parties; Recourse to Collateral ................. 37

XII    PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS ............................................................................................. 38

12.1. Resolution of Disputed Claims .................................................................... 38

12.2. Disallowance of Claims ............................................................................... 40

12.3. Amendments to Claims ................................................................................ 40

12.4. Single Satisfaction of Claims ........................................................................................ 40

XIII    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ......................... 40

13.1. Compromise and Settlement of Claims, Interests, and Controversies ............................ 41

13.2. Term of Injunctions or Stays ......................................................................................... 41

13.3. Exculpation; Limitation of Liability ............................................................................. 41

13.4. Mutual Releases by the Released Parties ....................................................................... 41

13.5. Injunction ..................................................................................................................... 42

XIV    SUBSTANTIAL CONSUMMATION OF THE PLAN ................................................... 43

14.1. Conditions Precedent to Consummation of the Plan ...................................................... 43

14.2. Waiver of Conditions .................................................................................................... 44

14.3. Substantial Consummation ............................................................................................ 44

14.4. Effect of Non-Occurrence of Conditions to the Effective Date ..................................... 44

XV    MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............................ 44

15.1. Modification and Amendments ...................................................................................... 44

15.2. Effect of Confirmation on Modifications ...................................................................... 44

15.3. Revocation or Withdrawal of the Plan ........................................................................... 44

XVI    RETENTION OF JURISDICTION ........................................................................... 45

XVII    MISCELLANEOUS PROVISIONS .......................................................................... 45

17.1. Immediate Binding Effect ............................................................................................. 45

17.2. Additional Documents ................................................................................................... 45

17.3. Reservation of Rights .................................................................................................... 45

17.4. Successors and Assigns ................................................................................................. 46

17.5. Service of Documents .................................................................................................... 46

17.6. Entire Agreement .......................................................................................................... 47

17.7. Nonseverability of Plan Provisions ............................................................................... 47

17.8. Votes Solicited in Good Faith ....................................................................................... 48

17.9. Waiver or Estoppel ........................................................................................................ 48

# I    INTRODUCTION

The Debtors hereby propose the following Combined Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code. Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Pursuant to the Plan, the Debtors seek resolution of outstanding Claims against, and Interests in, the Debtors, and the liquidation of the Debtors' remaining assets. On January 17, 2024, the Bankruptcy Court entered an order [Docket No. 42] authorizing the joint administration and procedural consolidation of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

This Combined Plan and Disclosure Statement contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, certain risk factors, a summary of the Plan, and a discussion of certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY AND CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# II    DEFINITIONS, COMPUTATION OF TIME, AND GOVERNING LAW

**A.    Defined Terms.** As used in this Plan, capitalized terms have the meanings set forth below.

**2.1.** "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

**2.2.** "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including, without limitation, the Bar Date Order.

**2.3.** "*Administrative Claims Objection Bar Date*" means the first Business Day that is 120 days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including, without limitation, the Bar Date Order.

**2.4.** "*Affiliate*" shall mean, with respect to any entity (the "Reference Entity"), (i) another entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the Reference Entity; (ii) another entity 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote, by the Reference Entity or by a third entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of

the Reference Entity; (iii) another entity whose business or substantially all of whose property is operated under a lease or operating agreement by the Reference Entity; or (iv) another entity that operates the business or substantially all of the property of the Reference Entity under a lease or operating agreement.

2.5. "*Allowed*" means with respect to Claims: (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order; *provided, further*, that the Debtors may deem Allowed any Claim described in clause (a) notwithstanding the fact that the period within which an objection may be interposed has not yet expired. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall not be treated as a Claim for purposes of voting and distribution. Notwithstanding anything to the contrary herein and to the maximum extent provided by applicable law, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor, as applicable. For the avoidance of doubt, to the maximum extent provided by applicable law and except as provided herein or otherwise agreed, no Proof of Claim filed after the applicable Claims Bar Date shall be treated as a Claim for purposes of voting and distribution absent further order of the Court. "Allow" and "Allowing" shall have correlative meanings.

2.6. "*Available Cash*" means all Cash of the Debtors on the Effective Date, to be distributed to the holders of Allowed Claims in accordance with the Combined Plan and Disclosure Statement, less (i) the Estimated Liquidation Expenses and (ii) the amount of Cash to be retained for the payment of Disputed Claims, from time to time.

2.7. "*Ballot*" means a ballot authorized by the Bankruptcy Court pursuant to the Disclosure Statement Order to indicate acceptance or rejection of the Plan.

2.8. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as the same may be amended from time to time.

2.9. "*Bankruptcy Court*" or "*Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the *Amended Standing Order of Reference* dated February 29, 2012, the United States District Court for the District of Delaware.

2.10. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

**2.11.** *"Bar Date"* means the date(s) fixed by order(s) of the Bankruptcy Court (including the Bar Date Order, this Plan or the Confirmation Order) by which any Person asserting a Claim against any Debtor must have filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against any such Debtor or be forever barred from asserting such Claim.

**2.12.** *"Bar Date Order"* means that certain *Order (I) Setting a Bar Date for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Setting a Bar Date for the Filing of Proofs of Claim by Governmental Units, (III) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (IV) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (V) Approving the Form of and Manner for Filing Proofs of Claim, (VI) Approving Notice of Bar Dates, and (VII) Granting Related Relief* [Docket No. 48].

**2.13.** *"Business Day"* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**2.14.** *"C-III Settlement Agreement"* means the settlement agreement between JERIT and C-III Manager described in Section 3.5.

**2.15.** *"C-III Subordinated Claim"* has the meaning set forth in Section 3.5.

**2.16.** *"Cash"* means the legal tender of the United States or the equivalent thereof.

**2.17.** *"Causes of Action"* means, subject to the releases, exculpations, and injunctions set forth in the Plan, any claim, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, and which was property of the Debtors or in which the Debtors held rights as of the Effective Date.

**2.18.** *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases commenced by the Debtors on the Petition Date and styled *In re JER Investors Trust Inc.*, Case No. 23-12109 (TMH), which currently are pending before the Bankruptcy Court.

**2.19.** *"Claim"* shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

**2.20.** *"Claims Bar Date"* means the bar date by which a Proof of Claim must be or must have been Filed, as established by (a) a Final Order of the Bankruptcy Court, including, without limitation, the Bar Date Order, or (b) pursuant to the Plan.

**2.21.** "*Claims Objection Bar Date*" means the first Business Day that is 180 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court upon a motion Filed by the Debtors (which may be served on only the Bankruptcy Rule 2002 service list, and which motion shall not be deemed a motion to modify the Plan).

**2.22.** "*Claims Register*" means the official register of Claims maintained by the clerk of the Bankruptcy Court.

**2.23.** "*Class*" means a category of holders of Claims or Interests as set forth in Article V hereof pursuant to section 1122(a) of the Bankruptcy Code.

**2.24.** "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

**2.25.** "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

**2.26.** "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

**2.27.** "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**2.28.** "*Consummation*" means the occurrence of the Effective Date.

**2.29.** "*Convenience Claim*" means a General Unsecured Claim in the amount of $5,000 or less.

**2.30.** "*Cure Obligations*" means: (a) all amounts (or such other amount as may be agreed upon by the parties under an Executory Contract) required to cure any monetary defaults, and (b) any other obligations required to cure any nonmonetary defaults under any Executory Contract that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

**2.31.** "*D&Os*" means any individual who served as a director, officer or manager of a Debtor at any time, solely in such capacity.

**2.32.** "*D&O Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', and officers' liability.

**2.33.** "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in these Chapter 11 Cases.

**2.34.** "*Debtors*" means, collectively and severally: (a) JER Investors Trust Inc. (whether in its capacity as debtor-in-possession, Reorganized Debtor, or otherwise); and (b) JERIT Non-CDO CMBS 1 LLC.

2.35. "*Disallowed*" means, with respect to any Claim, or any portion thereof, that such Claim, or any portion thereof, is not Allowed.

2.36. "*Disclosure Statement Order*" means the order (a) conditionally approving the disclosure statement-related provisions of this Combined Plan and Disclosure Statement and (b) approving the Solicitation Procedures.

2.37. "*Disputed*" means, with respect to any Claim, any Claim or portion thereof that (a) is not yet Allowed or (b) has not been Disallowed.

2.38. "*Disputed Claims Reserve*" means a Cash and/or Eligible Investment reserve, if any, that may be funded by the Debtors with a portion of the Available Cash for distributions to holders of Disputed Claims if and to the extent that such Disputed Claims become Allowed Claims.

2.39. "*Distribution Record Date*" means the first Business Day that is two Business Days after the Confirmation Date.

2.40. "*Effective Date*" means the date selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Article XIV of the Plan have been satisfied or waived. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

2.41. "*Eligible Investment*" means debt securities having the full faith and credit of the United States with respect to principal and interest and Federal Deposit Insurance Corporation-insured certificates of deposit and term deposits, in each case with a maturity or penalty-free withdrawal of 18 months or less from the date of purchase.

2.42. "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

2.43. "*Exculpated Parties*" means: (a) each of the Debtors and, in their respective capacities as such, each of their officers and directors; and (b) each of the Professionals.

2.44. "*Estate*" means, as to each Debtor, the estate created for such Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

2.45. "*Estimated Liquidation Expenses*" means the amount of Cash estimated by the Debtors, from time to time, as necessary to fund adequately the administration of the Combined Plan and Disclosure Statement on and after the Effective Date.

2.46. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

2.47. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Effective Date.

**2.48.** "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

**2.49.** "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Court (or the clerk of such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been reversed, stayed, modified, amended, or vacated, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal have expired, and such order shall have become final in accordance with rule 8002 of the Bankruptcy Rules; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

**2.50.** "*General Unsecured Claim*" means any Claim against the Debtors that is not otherwise paid in full during the Chapter 11 Cases and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) a Convenience Claim; (f) a Junior Subordinated Note Claims; (g) a C-III Subordinated Claim; or (h) an Intercompany Claim.

**2.51.** "*Impaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**2.52.** "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable.

**2.53.** "*Indenture Trustee*" means The Bank of New York Mellon Trust Company, National Association, in its capacity as trustee under the Junior Subordinated Indenture Agreement.

**2.54.** "*Initial Distribution Date*" means the date on which the Debtors make initial distributions to holders of Allowed Claims pursuant to the Plan.

**2.55.** "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

**2.56.** "*Interest*" means any interest, equity, or share in a Debtor, including all options, warrants, or other rights to obtain such an interest or share in such Debtor, whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security,

including any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising therefrom.

2.57. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief*, entered on January 17, 2024 [Docket No. 45].

2.58. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

2.59. "*Junior Subordinated Notes*" has the meaning set forth in Section 3.2.

2.60. "*Junior Subordinated Note Claims*" means all Claims arising under the Junior Subordinated Notes and the Junior Subordinated Indenture Agreement.

2.61. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

2.62. "*Local Bankruptcy Rules*" means the local rules of bankruptcy practice and procedure of the United States Bankruptcy Court for the District of Delaware.

2.63. "*New Common Stock*" means the common stock in the Reorganized Debtor to be authorized, issued or outstanding on or after the Effective Date.

2.64. "*Non-Cash Assets*" means any property of any Debtor, including any causes of action, which (a) may be a source of creditor recovery if and to the extent liquidated and (b) is not Cash.

2.65. "*Order*" means an order of the Bankruptcy Court.

2.66. "*Ordinary Course Professional*" means professionals employed by the Debtors in the ordinary course of their business pursuant to the Ordinary Course Professionals Order.

2.67. "*Ordinary Course Professionals Order*" means the *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief*, entered on January 17, 2024 [Docket No. 46].

2.68. "*Other Priority Claim*" means a Claim asserting a priority described in section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; (b) a Professional Fee Claim; or (c) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

2.69. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

2.70. "*Petition Date*" means December 29, 2023, the date on which the Debtors commenced the Chapter 11 Cases.

**2.71.**  "*Plan Administrator*" means Matthew Dundon or his successor as designated pursuant to Section 7.4.

**2.72.**  "*Plan Administrator Agreement*" means an agreement to be entered into between the Debtors and the Plan Administrator, setting forth the Plan Administrator's powers and responsibilities.

**2.73.**  "*Plan*," "*Plan and Disclosure Statement*," or "*Combined Plan and Disclosure Statement*" means this *Modified Combined Disclosure Statement and Chapter 11 Plan,* as amended, supplemented, or otherwise modified from time to time, including the Plan Supplement, which is incorporated in the Plan by reference and made part of this Plan as if set forth in the Plan.

**2.74.**  "*Plan Distributable Cash*" means Available Cash, less (i) the amount of the Professional Fee Escrow, and (ii) the amount necessary to pay in full all Allowed Administrative Claims, Allowed Priority Claims, and Allowed Convenience Claims.

**2.75.**  "*Plan Supplement*" means the supplements to the Plan containing, among other things, the form Plan Administrator Agreement, the list of executory contracts to be assumed pursuant to the Plan (if any), and the forms of any organizational documents relevant to the post-confirmation Debtors.

**2.76.**  "*Priority Claims*" means, collectively the: (a) Administrative Claims; (b) Priority Tax Claims; and (c) Other Priority Claims.

**2.77.**  "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**2.78.**  "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

**2.79.**  "*Professional*" means any Entity retained in the Chapter 11 Cases in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 326, 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code, and, after the Effective Date, any Entity retained by the Plan Administrator to assist him to effectuate the provisions of this Plan.

**2.80.**  "*Professional Fee Claims*" means all Claims for reasonable and documented accrued fees and expenses for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Court and regardless of whether a monthly fee statement or interim fee application has been Filed for such fees and expenses. To the extent the Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**2.81.**  "*Professional Fee Escrow*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as soon as reasonably practicable after the Effective Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed and unpaid Professional Fee Claims. Such Cash shall be held by the Debtors in a segregated account and shall remain subject to the jurisdiction of the Bankruptcy Court.

**2.82.**  "*Professional Fee Escrow Amount*" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Section 4.2 hereof.

**2.83.**  "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

**2.84.**  "*Released Parties*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) C-III JERIT Manager LLC; (c) solely in their respective capacities as such, the Affiliates, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals of each Entity in clauses (a) and (b); and (d) the Debtors' D&Os.

**2.85.**  "*Reorganized Debtor*" means Debtor JER Investors Trust Inc. upon and after the occurrence of the Effective Date.

**2.86.**  "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**2.87.**  "*Solicitation Date*" means the date upon which the Debtors commence the solicitation process in accordance with the Disclosure Statement Order.

**2.88.**  "*Solicitation Procedures*" means that form of solicitation procedures approved by the Disclosure Statement Order.

**2.89.**  "*Subsequent Distribution Date*" means the date following the Initial Distribution Date on which the Debtors in their reasonable discretion elect to make distributions to holders of Allowed Claims pursuant to the Plan.

**2.90.**  "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**2.91.**  "*United States*" means the United States of America and its agencies.

**2.92.**  "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

**2.93.**  "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**2.94.**  "*Wind Down*" means the wind down and dissolution of the Debtors' Estates

following the Effective Date as set forth in Section 7.5 hereof.

**B.      Rules of Interpretation**.

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" or "Sections" are references to Articles or Sections of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (11) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (12) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state corporate laws; (13) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (14) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

**C.      Computation of Time**.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.      Governing Law**.

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be

governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflict of laws principles.

**E.      Reference to Monetary Figures**.

All references in the Plan to monetary figures shall refer to currency of the United States, unless otherwise expressly provided in the Plan.

**F.      Controlling Document**.

In the event of an inconsistency between the Plan and the Plan Supplement, the Plan shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## III      BACKGROUND AND DISCLOSURES

### 3.1.  The Debtors' General Background

JER Investors Trust Inc. ("JERIT") was organized on or about April 19, 2004, by J.E. Robert Company ("JER") primarily to originate and acquire real estate debt securities and loans. JERIT is a Maryland corporation that qualifies as a real estate investment trust (a "REIT"). JERIT became a public company in July 2005. JERIT has 100,000,000 shares of common stock authorized and 5,831,029 shares of common stock issued and outstanding at December 31, 2022. JERIT has not issued any preferred shares.

JERIT entered into a management agreement with JER Commercial Debt Advisors LLC (the "Initial REIT Advisor") on June 4, 2004, which was subsequently amended on January 1, 2006, January 1, 2008, July 21, 2009, October 14, 2009, and December 9, 2009 (the "Original Management Agreement").

Between inception and 2007, JERIT made significant investments in commercial real estate related assets.  These investments performed poorly during and after the general decline in real estate related assets which preceded and coincided with the 2008-2009 global financial crisis. By mid-2009, JERIT's common stock traded at approximately 35 cents per share, down from a high of $107 per share at the end of 2006.  JERIT defaulted upon interest rate swap obligations to the National Australia Bank Limited, and incurred payment defaults both on the Junior Subordinated Notes and debt obligations of the CDO issuers and co-issuers.

JERIT was delisted from the New York Stock Exchange in 2009 and filed a Form 15-15D to terminate its registration with and reporting to the Securities and Exchange Commission in 2010. JERIT's commons stock has subsequently been quoted and traded over the counter under the ticker "JERT" in very low volumes and recently (as of September 25, 2023) at a price of one-fiftieth of one cent ($0.0002).

Historically, JERIT's assets primarily consist or consisted of equity interests in a number of subsidiaries, as follows:

1.   100% of the membership interests of JER CRE CDO 2005-1, LLC, a Delaware limited

11

liability company. This entity was the co-issuer of notes with 2005 CDO Issuer (defined below). It was wound up and dissolved in 2023.

2. 100% of the outstanding and issued shares of JER CRE CDO 2005-1, Limited, a Cayman Islands exempted company (the "2005 CDO Issuer"). The 2005 CDO Issuer owned assets contributed to the 2005 CDO and issued notes and preferred shares. It was wound up and dissolved in 2023.

3. 100% of the membership interests of JER CRE CDO 2005-1 Depositor, LLC, a Delaware limited liability company, which in turn owns 100% of the issued and outstanding preferred shares of the 2005 CDO Issuer. This entity was wound up and dissolved in 2023.

4. 100% of the membership interests of non-debtor JER CRE CDO 2006-2, LLC ("2006 CDO Co-Issuer"), a Delaware limited liability company. This entity is the co-issuer of notes with 2006 CDO Issuer (defined below).

5. 100% of the outstanding and issued shares of non-debtor JER CRE CDO 2006-2, Limited, a Cayman Islands exempted company ("2006 CDO Issuer"). The 2006 CDO Issuer owns assets contributed to the 2006 CDO and the 2006 CDO issued notes and preferred shares.

6. 100% of the membership interests of non-debtor JER CRE CDO 2006-2 Depositor, LLC, a Delaware limited liability company (the "2006-2 Depositor") which in turns owns 100% of the issued and outstanding preferred shares of the 2006 CDO Issuer. The 2006-2 Depositor also holds 100% of the Class J-FX Deferrable Interest Fixed Rate Notes, Class K Deferrable Interest Fixed Rate Notes, and Class L Deferrable Interest Fixed Rate Notes issued by the 2006 CDO Issuer.

7. 100% of the issued and outstanding shares of non-debtor JER TRS Holding Company Inc., a Delaware corporation. This entity was a taxable REIT subsidiary of JERIT within the meaning of IRC § 856(1).

8. 100% of the issued and outstanding shares of non-debtor JERIT TS Administration LLC, a Delaware limited liability company.

9. 100% of the membership interests of non-debtor JERIT Non-CDO Assets Holding LLC, a Delaware limited liability company.

10. 100% of the membership interests of Debtor JERIT Non-CDO CMBS 1 LLC ("JNCDO"), a Delaware limited liability company. JNCDO held 61% interests in certain appraisal subordination entitlement reduction ("ASER") CMBS bonds.

Non-debtors 2006 CDO Co-Issuer, 2006 CDO Issuer and 2006-2 Depositor are deeply insolvent. Accordingly, JERIT's equity interests in those entities have no value and will be abandoned.

The 2005 CDO and 2006 CDO generated approximately $1.3 billion in net operating losses ("NOLs") since 2009. As part of the wind-down of the 2005 CDO, approximately $244.74 million of NOLs were used to offset cancellation of debt income ("CODI"), leaving approximately $1.02 billion in NOLs. The Debtors anticipate that the 2006 CDO will likewise use NOLs to offset CODI, to the extent any is recognized, when it winds down. The Debtors have not as of yet identified any feasible mechanism to generate value beyond such CODI offset for themselves, their non-debtor affiliates or the Debtors' creditors.

Prior to the Petition Date, the Debtors reached out to holders of the Junior Subordinated Notes to gauge interest in a plan structure that would preserve and monetize the Debtors' NOLs. The Debtors remain open to continuing those discussions should any creditors express interest. However, absent such discussions yielding a feasible mechanism to preserve and exploit NOLs acceptable to the Debtors and their creditors, the Debtors' presently proposed Plan (as below defined) would eliminate any NOL value not used to set off CODI.

### 3.2. The Junior Subordinated Notes

On April 9, 2007, JERIT TS Statutory Trust I, a Delaware trust and an unconsolidated subsidiary of JERIT issued $60.0 million of trust preferred securities ("TRUPs"). On May 29, 2009, JERIT entered into an agreement with two holders of the TRUPs, with an aggregate liquidation amount of $56.3 million, to exchange those holders' TRUPs for $70.3 million in face value of unsecured junior subordinated notes (the "Junior Subordinated Notes") that are due in 2037 (the "Exchange Transaction") and subject to that certain Junior Subordinated Indenture between JER Investors Trust Inc. and The Bank of New York Mellon Trust Company, National Association as Trustee, dated as of May 29, 2009 (as amended from time to time, the "Junior Subordinated Indenture Agreement"). Thereafter, as of December 31, 2009, through a series of other transactions including cash payments and the issuance of common stock of JERIT to the holders of the TRUPs in exchange for their participation in the Exchange Transaction, the remaining outstanding balance of the TRUPs was cancelled or satisfied. On February 1, 2010, JERIT failed to make a $0.1 million payment to the holders of the Junior Subordinated Notes and did not cure the default during the permitted grace period. As of the date hereof, to the best of the Debtors' knowledge, the Junior Subordinated Notes have not been accelerated. The total amount outstanding under the Junior Subordinated Notes, including interest, is approximately $93,878,204.00.

None of JERIT's other outstanding pre-petition obligations appears to be debt of a type to which the Junior Subordinated Notes are subordinated by the terms of their indenture.

### 3.3. The 2011 Transaction

In 2011, C-III Capital Partners LLC ("C-III") entered into a transaction with JER and Initial REIT Advisor under which C-III acquired, among other things, the right to act as external REIT manager to JERIT (the "Transaction"). As part of the Transaction, C-III affiliate C-III JERIT Manager LLC ("C-III Manager") replaced Initial REIT Advisor. C-III Manager and JERIT entered into an amended and restated management agreement dated as of August 30, 2011 (the "Management Agreement"), which was substantially similar to the terms of the Original Management Agreement. The Management Agreement provided for payment of compensation

and reimbursement of fees to C-III Manager, as well as a fee for termination of the Management Agreement.

Between 2011 and 2023, JERIT's board of directors consisted of Lawrence Block and Joseph Lytle, both of whom are affiliated with C-III, and independent director Steven Bartlett. In July 2023, the board appointed Matthew Dundon of Dundon Advisers LLC as Chief Restructuring Officer. On September 20, 2023, Stephen Kovacs was appointed to serve as an independent director of JERIT (the "Independent Director") and on December 20, 2023, the remaining directors of JERIT resigned. As of the Petition Date, the Independent Director was the sole director of JERIT.

### 3.4. Events Leading to Chapter 11

The Debtors had few liquid assets between the commencement of C-III Manager's management of JERIT and 2019.

JNCDO held a 61% interest in certain ASER bonds related to the construction of Algonquin Commons, a Chicago-area shopping center. The borrower stopped making payments in 2012, and eight years of litigation ensued. In December 2020, an Illinois appellate panel affirmed a ruling in favor of lender US Bank and against the mall operator for more than $120 million under the mall operator's guaranty. Pursuant to a subsequent settlement, JNCDO received approximately $18 million on account of its interest in the ASER bonds in 2021 and 2022.

Since 2019, JNCDO has also received approximately $5.5 million from other investments, including the sale of an REO property out of special servicing and anticipated repayment date (ARD) interest on certain loans.

While the Debtors' available cash will provide a substantial recovery for unsecured creditors, those funds will not be sufficient to pay creditors in full.

Given the absence of any prospect for a full recovery for the Debtors' creditors, or any recovery at all for JERIT's shareholders, the Debtors determined that it would be in their interest to wind down and distribute this cash, less wind-down costs, to their creditors. The Debtors considered various options to effectuate the wind-down. Considering, among other things, that JERIT remains a public company with widely-dispersed shareholders, and that there has been no quorum at any annual shareholder meeting since at least 2011, the Debtors determined that a wind-down under state law would not be practicable. Instead, the Debtors concluded the most efficient way to effect creditor distributions and wind-down is through these Chapter 11 Cases.

### 3.5. The C-III Settlement

Prior to the Petition Date, the Debtors determined that it was in their best interest to terminate the Management Agreement, as the level of services provided under that agreement would not be needed going forward. C-III Manager agreed instead to enter into a limited Administrative Services Agreement, at a significantly reduced cost, to ensure that the Debtors would continue to have access to their books and records maintained on C-III Manager's computer system and to C-III personnel who have historical knowledge of the company and its business affairs.

The Management Agreement provided, upon termination, for payment to C-III Manager of a $15 million termination fee (the "Termination Fee"). The Management Agreement also contemplated that, during the term of the agreement, C-III Manager would be compensated for certain services provided to JERIT and reimbursed for overhead expenses in the amount of $500,000 annually, adjusted for inflation. However, JERIT did not compensate C-III Manager for such services, and at least since 2013, C-III Manager collected from JERIT less than half the overhead reimbursement to which was entitled.

On or about December 23, 2023, JERIT and C-III Manager entered into the C-III Settlement Agreement under which C-III Manager agreed to waive its claims for uncompensated services and unpaid reimbursement expenses, subordinate $5 million of its Termination Fee claim (the "C-III Subordinated Claim"), and provide ongoing services to the Debtors pursuant to an administrative services agreement. In turn, JERIT agreed to seek to allow the remainder of the Termination Fee claim, and to grant releases to C-III and its affiliates and to JERIT's pre-petition directors and officers.

Prior to JERIT's entry into the Settlement Agreement, the Independent Director, with assistance of counsel reporting solely to him, conducted an investigation of the actions of, and the Debtors' transactions with, C-III Manager, as well as the actions of the Debtors' other directors and its officers. Through that investigation, the Independent Director did not find evidence of any colorable causes of action held by JERIT against C-III Manager or the JERIT's other directors or its officers. The Independent Director authorized the Settlement Agreement as fair and reasonable to JERIT.

### 3.6. The Chapter 11 Cases.

(a)     *Initial Motions.*

On the Petition Date, the Debtors filed a number of motions that were essential for the Debtors' transition to chapter 11, the protection of the interests of the Estates, and orderly administration of the Chapter 11 Cases. However, because the Debtors did not require the type of expedited or interim relief typically sought in "first day" motions, such motions were filed on notice, giving all interested parties an opportunity to object. The motions included a motion for joint administration of the Debtors' cases; a motion to authorize the Debtors to continue to use their prepetition cash management system; a motion authorizing the Debtors to pay insurance premiums; a motion to employ certain ordinary course professionals; a motion to set the bar date for the filing of proofs of claim; a motion to authorize the retention of ordinary course professionals; and a motion to authorize the assumption of the Administrative Services Agreement (as defined and further described below).

(b)     *Retention of Professional Advisors.*

- Prior to the Petition Date, the Debtors' board of directors appointed Matthew Dundon to serve as the Debtors' Chief Restructuring Officer and retained the firm of which Mr. Dundon is a principal, Dundon Advisers LLC, to provide financial advisory services.

- As part of the Chapter 11 Cases, the Bankruptcy Court entered Orders authorizing the

Debtors to retain (i) Dundon Advisers as the Debtors' financial advisory firm and designate Matthew Dundon as Chief Restructuring Officer [Docket No. 57]; (ii) Troutman Pepper Hamilton Sanders LLP as bankruptcy counsel to the Debtors [Docket No. 60]; and Seward & Kissel LLP as special counsel to the Debtors [Docket No. 59].

(c)    *Schedules and Bar Date Order.*

- On January 9, 2024, each Debtor filed its respective Schedules and Statement of Financial Affairs. Among other things, the Schedules set forth the Claims of known creditors against the Debtors as of the Petition Date, based on the Debtors' books and records. The Debtors retain the right to amend the Schedules during the pendency of the Chapter 11 Cases.

- On February 5, 2024, the United States Trustee held a meeting of creditors in these Chapter 11 Cases pursuant to section 341 of the Bankruptcy Code.

- Pursuant to the Bar Date Order, the Bankruptcy Court established the following bar dates for filing proofs of claim: February 22, 2024.

## IV    ADMINISTRATIVE AND PRIORITY CLAIMS

### 4.1. Administrative Claims.

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, except to the extent that a holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Debtors shall pay each holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the Debtors; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

(a)                    *Administrative Claims Bar Date.*

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by this Article IV, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall not be entitled to any distribution from the Debtors or the Estates, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.

Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

### 4.2. Professional Compensation.

(a)    *Final Fee Applications and Payment of Professional Fee Claims.*

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, shall be Filed no later than 60 days after the Effective Date. All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders, including the Interim Compensation Order, and once approved by the Court, shall be promptly paid from the Professional Fee Escrow up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Section 4.1 of the Plan.

(b)    *Professional Fee Escrow.*

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow. The Professional Fee Escrow shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account (i) shall promptly be transferred to the Debtors' primary account, and (ii) shall be distributed in accordance with the Plan without any further action or order of the Court.

(c)    *Estimation of Fees and Expenses.*

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Effective Date, as well as their anticipated fees and expenses in connection with their final fee applications, and shall deliver such estimate to the Debtors no later than five business days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

(d)    *Post-Effective Date Fees and Expenses.*

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Plan Administrator shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the necessary, reasonable, actual, and documented legal, professional, or other fees and expenses incurred on or after the Effective Date by the Professionals. Upon the Effective Date, any requirement that Professionals comply

with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Plan Administrator may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.3. Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 4.4. U.S. Trustee Statutory Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors and the Reorganized Debtor shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Plan Administrator on behalf of the Reorganized Debtor shall file with the Bankruptcy Court UST Form 11-PCR reports when they become due. Each and every one of the Debtors and the Reorganized Debtor shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

## V        CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article V.

**This Plan provides for the substantive consolidation of the assets and liabilities of the Debtors. All of the assets and liabilities of the Debtors are treated, for all purposes under the Plan, as the assets and liabilities of a single consolidated entity. Claims filed against more than one of the Debtors and seeking recovery of the same debt shall be treated as one non-aggregated Claim against the consolidated Estates to the extent that such Claim is an Allowed Claim. The basis for substantive consolidation is discussed in Section 7.1, *infra*.**

### 5.1. Summary of Classifications.

All Claims and Interests, other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, are classified in the Classes set forth in this Article V for all purposes, including voting, Confirmation, and distributions under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to

the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Class or Classes shall be treated as set forth in Section 5.4 hereof.

(a)    *Class Identification.*

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as set forth below. The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distributions received by holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Plan and Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

To the extent there are no holders of Claims or Interests in a particular Class or Classes, such Claims or Interests shall be treated as set forth in Section 5.4 hereof.

| Class | Claim and Interests | Status | Voting Rights | Projected Recovery |
|-------|---------------------|--------|---------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Convenience Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote | 19.46%-20.05% |
| 4 | Junior Subordinated Note Claims | Impaired | Entitled to Vote | 19.46%-20.05% |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 6 | Subordinated C-III Claim | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 7 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

**5.2. Treatment of Classes of Claims and Interests.**

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of (i) the Effective Date or as soon as reasonably practicable thereafter, or (ii) fifteen (15) Business Days after such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest.

1.    <u>Class 1 – Other Priority Claims</u>.

    (a)    *Classification*. Class 1 consists of Other Priority Claims against the Debtors.

    (b)    *Treatment*. Each holder of an Allowed Class 1 Claim shall receive payment in full in Cash.

    (c)    *Voting*. Class 1 is Unimpaired. Each holder of an Allowed Class 1 Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Convenience Claims</u>.

    (a)    *Classification*. Class 2 consists of all Convenience Claims against the Debtors.

    (b)    *Treatment*. Each holder of an Allowed Class 2 Claim shall receive payment in full in Cash.

    (c)    *Voting*. Class 2 is Unimpaired. Each holder of an Allowed Class 2 Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – General Unsecured Claims</u>.

    (a)    *Classification*. Class 3 consists of all General Unsecured Claims against the Debtors.

    (b)    *Treatment*. Each holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, and release of, and in exchange for such Allowed General Unsecured Claim such holder's Pro Rata Share of the Plan Distributable Cash.

    (c)    *Voting*. Class 3 is Impaired. Each holder of an Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

4.      <u>Class 4 – Junior Subordinated Note Claims</u>.

(a)      *Classification*. Class 4 consists of all Junior Subordinated Note Claims against the Debtors.

(b)      *Treatment*. The Indenture Trustee, for the ratable benefit of the holders of the Junior Subordinated Notes and itself, shall receive in full satisfaction, settlement, and release of all Allowed Junior Subordinated Note Claims the Pro Rata Share of the Plan Distributable Cash for such Allowed Claims. As no "Senior Debt" (within the meaning of that term given by the Junior Subordinated Indenture) in favor of which the Junior Subordinated Notes are by such indenture's terms subordinated, is presently outstanding, the Junior Subordinated Note Claims are *pari passu* with General Unsecured Claims. For the avoidance of doubt, amounts received by the Indenture Trustee on account of the Allowed Junior Subordinated Note Claims will be subject to the Indenture Trustee's charging lien and priority of payment rights under the Junior Subordinated Indenture Agreement.

(c)      *Voting*. Class 4 is Impaired. Each holder of an Allowed Class 4 Claim is entitled to vote to accept or reject the Plan.

5.      <u>Class 5 – Intercompany Claims</u>.

(a)      *Classification*. Class 5 consists of all Intercompany Claims against any of the Debtors.

(b)      *Treatment*. As a consequence of substantive consolidation of the Debtors' assets and liabilities, Class 5 Claims will be extinguished as of the Effective Date, and will be of no further force or effect, and each holder of a Class 5 Claim will not receive any distribution on account of such Class 5 Claim.

(c)      *Voting*. Class 5 is Impaired. Each holder of a Class 5 Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

6.      <u>Class 6 – C-III Subordinated Claim</u>.

(a)      *Classification*. Class 6 consists of the C-III Subordinated Claim.

(b)      *Treatment*. Because holders of General Unsecured Claims and Junior Subordinated Note Claims will not be paid in full under the Plan, the holder of the Class 6 Claim will not receive any distribution on account of such Class 6 Claim. In full settlement and satisfaction of the Class 6 Claim, the holder of the Class 6 Claim will receive on account of such Claim only the benefit of the releases provided in Section 13.4 of the Plan.

(c)      *Voting*. Class 6 is Impaired. The holder of the Class 6 Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, such holder is not entitled to vote to accept or reject the Plan.

7.    Class 7 – Interests.

(a)    *Classification*. Class 7 consists of all Interests in the Debtors.

(b)    *Treatment*. Class 7 Interests will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each holder of a Class 7 Interest will not receive any distribution on account of such Class 7 Interest.

(c)    *Voting*. Class 7 is Impaired. Each holder of a Class 7 Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

**5.3.  Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors or the Debtors' Estates in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**5.4.  Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a holder of an Allowed Claim or Interest, or a holder of a Claim temporarily allowed under Bankruptcy Rule 3018(a), shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

**5.5.  Controversy Concerning Impairment.**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**5.6.  Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## VI    CONFIRMATION AND VOTING PROCEDURES

### 6.1. Confirmation Procedure.

The Disclosure Statement Order, among other things, conditionally approves the Combined Plan and Disclosure Statement for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for May 16, 2024, at 10:00 a.m. (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, Courtroom 6, Wilmington, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

### 6.2. Procedure for Objections.

Any objection to final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (a) the proposed attorneys for the Debtors, Troutman Pepper Hamilton Sanders LLP, 1313 Market Street, Suite 5100, Wilmington, DE 19899, Attn: David M. Fournier, Deborah Kovsky-Apap, Kenneth A. Listwak, and Tori L. Remington (david.fournier@troutman.com, deborah.kovsky@troutman.com, kenneth.listwak@troutman.com, and tori.remington@troutman.com); and (b) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Timothy J. Fox (email: timothy.fox@usdoj.gov) (collectively, the "Objection Recipients"); in each case, **by no later than May 6, 2024, at 4:00 p.m. (prevailing Eastern Time)**. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### 6.3. Requirements for Confirmation.

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 6.4. Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Debtors also are required, under section 1122

of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

### 6.5.  Impaired Claims or Interests.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are altered under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan. Under the Plan, holders of Claims or Interests in Classes 5, 6 and 7 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 AND 4**.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT AT:

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
**ATTN: MONICA MOLITOR**
**HERCULES PLAZA**
**1313 MARKET STREET, SUITE 5100**
**WILMINGTON, DE 19801**
**monica.molitor@troutman.com**

THE VOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE. IF YOU BELIEVE YOU REQUIRE LEGAL ADVICE, YOU SHOULD CONSULT WITH YOUR ATTORNEY.

### 6.6.  Voting Classes; Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request that the Bankruptcy Court deem the Plan to have been accepted by the holders of such Claims or Interests in such Class.

### 6.7.  Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that votes or is deemed to reject the Plan, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

The Debtors believe that the requirements of section 1129(b) of the Bankruptcy Code are satisfied. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists. At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from

25

receiving materially different treatment under a proposed plan without sufficient justifications for doing so. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different treatment. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for unsecured creditors and equity holders as follows:

(a)    _Unsecured Creditors_. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the Effective Date equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

(b)    _Interests_. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the Allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest or (ii) the holder of any interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required, because no holders of Claims or Interests junior to Classes 3 or 4 will receive or retain any property under the Plan on account of such Claims or Interests.

### 6.8. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). The Debtors commenced these Chapter 11 Cases to allow for an efficient and orderly wind down process and will not be conducting any business operations after the Effective Date. Thus, provided that the Combined Plan and Disclosure Statement is confirmed and consummated, the Estates will not be subject to future reorganization or liquidation. The Debtors therefore believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

### 6.9. Best Interests Test and Liquidation Analysis.

The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code. Because of the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under Chapter 7, the value of any distributions to holders of Claims in such event would be less than the value of distributions under this Combined Plan and Disclosure Statement. This is because conversion of the Chapter 11 Cases to chapter 7 cases would require

the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustees' likely retention of new professionals. The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with additional costs to the Estates and delay compared to the time of distributions under this Combined Plan and Disclosure Statement. In addition, C-III Manager has agreed to subordinate or waive millions of dollars of potential general unsecured claims pursuant to a chapter 11 plan including mutual releases, but likely would not do so in a chapter 7 case. As a result, the Debtors believe that the Estates would have fewer funds available for distribution and significantly greater claims in a hypothetical chapter 7 liquidation than they would if this Combined Plan and Disclosure Statement is confirmed, and therefore that holders of Allowed Claims would recover less in the hypothetical chapter 7 cases. Accordingly, Plan Proponents believe that the "best interest" test of Bankruptcy Code section 1129(a)(7) is satisfied.

A hypothetical chapter 7 liquidation analysis is attached to this Combined Plan and Disclosure Statement as **Exhibit A**.

## VII    MEANS FOR IMPLEMENTATION OF THE PLAN

### 7.1. Substantive Consolidation of the Debtors.

The Combined Plan and Disclosure Statement provides for substantive consolidation of the Debtors' Estates for all purposes under the Plan, including making distributions to holders of Allowed Claims. The Debtors propose substantive consolidation because the Debtors: (i) operated as an integrated business organization; (ii) filed consolidated tax returns; (iii) had the same management; and (iv) shared a unified cash management system under which the Debtors effectively functioned as a single entity. For the foregoing reasons, the Debtors believe that substantive consolidation is in the best interest of all creditors.

### 7.2. Vesting of Assets and Sources of Consideration for Plan Distributions.

Except as otherwise provided herein, upon the Effective Date all property of the Debtors' Estates shall vest in the Reorganized Debtor. The Plan shall be funded by Available Cash and Non-Cash Assets.

### 7.3. Corporate Action.

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for action by holders of Claims or Interests, the Debtors, or any other Entity or Person. The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

### 7.4. Plan Administrator

On the Effective Date, Matthew Dundon or (with Bankruptcy Court approval) his designee shall become Plan Administrator. The Plan Administrator shall have the responsibility and authority to effectuate the Plan and otherwise to cause the Debtors to take any actions permitted

or required of them under the Plan after the Effective Date, and for such purposes shall be the sole officer of each Debtor.  The Plan Administrator shall serve until the dissolution of the last Debtor to be dissolved, his or her death or resignation, or his or her removal by the Bankruptcy Court for good cause upon motion of a party in interest.  Upon the occurrence of any vacancy or making of any notice of intended resignation in the Plan Administrator position, the Bankruptcy Court shall appoint a successor from among the nominee(s) (made by motion) of the resigned or resigning Plan Administrator or any other party in interest.

On the Effective Date, the Reorganized Debtor shall be authorized to, and shall, issue one share of New Common Stock to the Plan Administrator, free and clear of all Liens, Claims and encumbrances, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization or approval of any Person. Other than as contemplated through the issuance of New Common Stock pursuant to this Plan, there shall exist on the Effective Date no other equity securities, warrants, options, or other agreements to acquire any equity interest in the Reorganized Debtor. The sole purpose of the issuance of New Common Stock to the Plan Administrator is to facilitate the performance of the Plan Administrator's duties under this Plan.  The share issued to the Plan Administrator shall not be transferable or assignable except to a subsequent Plan Administrator, nor shall additional shares be issued.

The Plan Administrator Agreement shall be filed as part of the Plan Supplement.

**7.5. Closing the Chapter 11 Cases and Wind Down of the Debtors and Their Non-Debtor Subsidiaries**.

On the Effective Date, the Chapter 11 Case of JERIT Non-CDO CMBS 1 LLC, Case No. 23-12108 (TMH) shall close.  For the avoidance of doubt, on the Effective Date, a separate proposed order shall be submitted to the Bankruptcy Court in accordance with Local Bankruptcy Rule 1017-3.  Any matters which subsequently come before the Court concerning the erstwhile Debtor of such closed Chapter 11 Case shall be considered under the remaining open Chapter 11 Case of JERIT (Case No. 23-12109 (TMH)).  Promptly following completion of all distributions to made in accordance with this Plan, including with respect to Professional Fee Claims and U.S. Trustee fees, and the completion of all wind down activities contemplated herein, JERIT shall seek authority from the Bankruptcy Court to close its Chapter 11 Case.

As soon as practicable on or after the Effective Date, the Plan Administrator shall: (1) establish and fund with Cash and/or Eligible Investments the Disputed Claims Reserve and establish and fund with Cash accounts earmarked for (x) any initial distribution under this Plan and (y) Estimated Liquidation Expenses, (2) in his reasonable discretion, complete and file all final or otherwise required federal, state, and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of each Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; (3) seek to liquidate Non-Cash assets as more specifically set forth below, (4) compensate himself at his standard hourly rates, compensate Professionals, pay expenses, and pay U.S. Trustee fees each incurred after the Effective Date (including to the extent the costs of the same exceed the Estimated Liquidation Expenses), and (4) effect the dissolution or termination of existence under applicable state law of each Debtor and the

Reorganized Debtor when all of its duties under this Plan have been fulfilled, any disputes relating to Claims against it or otherwise have been resolved or abandoned, and (4) take such other actions he may determine to be necessary or desirable to carry out the purposes of the Plan. Except where the Bankruptcy Code and Bankruptcy Rules prohibit, any of the foregoing may be performed by or for each Debtor after the closure of JERIT's Chapter 11 Case.

The Plan Administrator shall after the Effective Date seek to liquidate Non-Cash Assets. He may retain and compensate Professionals, including but not limited to on a contingent basis, to do so. He may make demands and bring lawsuits in his own name, but solely in his official capacity, or in the name of any Debtor, and settle and compromise each such demand or lawsuit for terms he reasonably determines to be adequate, and withdraw or dismiss any demand or lawsuit he reasonably determines should no longer be pursued. He may, at any time, liquidate a Non-Cash Asset by selling it in its contingent or disputed form, including, at a discount to its face value. He may, at any time, liquidate all or a portion of the Non-Cash Assets in gross by way of a "remnant sale" or otherwise. He shall, prior to or upon the dissolution or termination of existence of each Debtor, abandon or sell in gross all remaining Non-Cash Assets of such Debtor.

From and after the Effective Date, Debtor JNCDO (a) for all purposes shall be deemed to have withdrawn such Debtor's business operations from any state in which such Debtor was previously conducting, or is registered or licensed to conduct, its business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (b) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

As soon as practicable on or after the Effective Date, the Plan Administrator shall cause each of the Debtors' non-debtor subsidiaries to be dissolved under applicable state law. As soon as practicable after the Plan Administrator has taken all actions as the Plan Administrator deems necessary or desirable to carry out the purposes of the Plan, including filing final tax returns, the Plan Administrator shall cause JERIT to be dissolved under applicable state law.

In addition, each Interest in each of the Debtors shall be cancelled pursuant to this Plan without need of any further action of the Plan Administrator, any Debtor or the Court or any other court.

For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## VIII    TREATMENT OF EXECUTORY CONTRACTS

### 8.1.  Assumption and Assignment of Executory Contracts.

On the Effective Date, except as otherwise provided herein, each Executory Contract not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract: (1) is specifically described in the Plan or Plan Supplement as to be assumed in connection with confirmation of the Plan; (2) is subject to a pending motion to assume such Executory Contract as of the Effective Date; (3) is a contract, instrument, release, indenture, or other agreement or

document entered into in connection with the Plan; (4) is a D&O Policy; or (5) is the C-III Settlement Agreement, each of which shall be assumed by the Debtors. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

In addition, on the Effective Date, each indenture to which a Debtor is a party shall be deemed cancelled and terminated as to the Debtors. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such cancellations and terminations pursuant to section 1123(a)(5)(F) of the Bankruptcy Code.

### 8.2. Cure of Defaults for Assumed Executory Contracts.

Any Cure Obligations under each Executory Contract to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Obligation in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitation described below, by the Debtors as an Administrative Claim, or on such other terms as the parties to such Executory Contracts may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Unless otherwise provided by an order of the Bankruptcy Court, at least 14 days before the Confirmation Hearing, the Debtors shall cause notice of any proposed assumption of an Executory Contract and proposed Cure Obligations in connection therewith to be filed with the Bankruptcy Court and served upon the applicable counterparties. Any objection by such counterparty must be Filed, served, and actually received by the Debtors not later than 14 days after service of notice of the proposed assumption and associated Cure Obligations. Any counterparty to an Executory Contract that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Obligation.

Assumption of any Executory Contract pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time before the effective date of assumption and/or assignment. Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### 8.3. Claims Based on Rejection of Executory Contracts.

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts pursuant to the Plan or otherwise, must be

Filed with Bankruptcy Court and served on the Debtors no later than 30 days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract. In addition, any objection to the rejection of an Executory Contract must be Filed with the Bankruptcy Court and served on the Debtors no later than 14 days after service of the proposed rejection of such Executory Contract.

Any holders of Claims arising from the rejection of an Executory Contract for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, or the property of any of the foregoing without the need for any objection by the Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

### 8.4. Insurance Policies.

Continuing obligations of third parties to the Debtors under insurance policies or contracts that have ceased to be executory on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, or to provide indemnification, contribution or reimbursement, will continue and will be binding on such third parties, notwithstanding any provision to the contrary in this Plan, unless otherwise specifically terminated by the Debtors or by order of the Bankruptcy Court.

To the extent any insurance policy under which the insurer has a continuing obligation to pay the Debtors or a third party on behalf of the Debtors is held by the Bankruptcy Court to be an executory contract and is not otherwise assumed upon motion by a final order, such insurance policy will be treated as an executory contract that is assumed pursuant to section 365 of the Bankruptcy Code under this Plan.

### 8.5. Indemnification Obligations.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', officers' and managers' respective Affiliates, respectively, against any Claims or Causes of Action under the Indemnification Provisions or applicable law (collectively, the "Indemnification Obligations"), shall survive Confirmation, shall be assumed by the Reorganized Debtor on behalf of the applicable Debtor, and will remain in effect after the Effective Date if such Indemnification Obligation is owed in connection with an event occurring before the Effective Date; *provided that*, notwithstanding anything herein to the contrary, the

Debtors' obligation to fund any such Indemnification Obligations, or any advancement of attorneys' fees, expenses or other amounts related to the same, shall be limited to the extent of coverage available and actually funded under any insurance policy assumed by the Debtors, including the D&O Policies. The Reorganized Debtor shall have no obligation to reserve any amount for or related to any Indemnification Obligations.

### 8.6. Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease on Schedule G of the Debtors' Schedules or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract is or was executory at the time of assumption or rejection, the Debtors shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## IX   CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 9.1. The Plan May Not Be Accepted.

The Debtors can make no assurances that the requisite acceptances of the Plan will be received. In the event that the Plan is not accepted by the requisite number and amount of creditors, the Chapter 11 Cases may be converted to chapter 7 of the Bankruptcy Code.

### 9.2. The Plan May Not Be Confirmed.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what distribution the holders of Allowed Claims would receive. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets

in chapter 7, in which case it is likely that the holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

### 9.3. Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections.

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### 9.4. Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

### 9.5. Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

## X        CERTAIN TAX CONSIDERATIONS.

There are a number of material income tax considerations, risks, and uncertainties associated with the Plan described in the Combined Plan and Disclosure Statement.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

The Debtors will pay taxes on the taxable net income or gain allocable to holders of Disputed Claims on behalf of such holders. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Debtors as a result of the resolutions of such Disputed Claims.

## XI        PROVISIONS GOVERNING DISTRIBUTIONS

### 11.1.  Calculation of Amounts to Be Distributed.

Each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Plan Administrator. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article XII. Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

### 11.2.  Disputed Claims Reserve.

The Plan Administrator may maintain a Disputed Claims Reserve. The Plan Administrator may, in his reasonable discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, if and when Disputed Claims become Allowed Claims, as if such Disputed Claims were Allowed Claims as of the Effective Date. If all or any portion of a Disputed Claim shall become a Disallowed Claim, then the amount on deposit in the Disputed Claims  Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Disputed Claims Reserve, shall remain in the

Disputed Reserve to the extent that the Plan Administrator deems necessary to ensure that the Cash remaining in the Disputed Claims Reserve is sufficient to ensure that all Disputed Claims that become Allowed Claims will be paid in accordance with the Plan. Any amounts remaining in the Disputed Claims Reserve after resolution of all Disputed Claims shall be treated as Plan Distributable Cash.

### 11.3.  Interest and Penalties on Claims.

Except to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of an Allowed Claim shall be entitled to any interest or penalty accruing on any Claim from and after the Petition Date. Without limiting the foregoing, interest shall not accrue or be paid on any Claim after the Effective Date to the extent the final distribution paid on account of such Claim occurs after the Effective Date.

### 11.4.  Delivery of Distributions and Undeliverable, Unclaimed or Forfeited Distributions.

(a)     *Record Date for Distribution.*

On the Distribution Record Date, the Claims Register shall be closed and the Plan Administrator or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

(b)     *Delivery of Distributions in General.*

(i)     <u>Payments and Distributions on Disputed Claims</u>. Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the Plan Administrator's reasonable discretion, be deemed to have been made by the Plan Administrator on the Effective Date, unless the Plan Administrator and the applicable holder of such Claim agree otherwise.

(ii)    <u>Special Rules for Distributions to holders of Disputed Claims and Interests</u>. Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Plan Administrator, on the one hand, and the holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interests, other than with respect to Professional Claims, until all Disputed Claims or Interests held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)     *Fractional Cents.* Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

(d)     *Minimum; De Minimis Distributions.* Notwithstanding anything to the contrary contained

in the Plan, the Plan Administrator shall not be required to distribute, and shall not distribute, Cash or other property to the holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100. Any holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim against the Debtors.

(e)     *Undeliverable Distributions and Unclaimed Property.* All distributions to holders of Allowed Claims not made by wire transfer shall be made at the address of such holder as set forth in the Claims Register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a holder in a manner reasonably acceptable to the Plan Administrator) or, in the absence of a Filed proof of Claim, the Schedules, on the Effective Date. The responsibility to provide the Debtors a current address of a holder of Claims shall always be the responsibility of such holder and at no time shall the Plan Administrator have any obligation to determine a holder's current address. Nothing contained in the Plan shall require the Debtors to attempt to locate any holder of an Allowed Claim. Amounts in respect of undeliverable distributions made by the Plan Administrator shall be held in trust on behalf of the holder of the Claim to which they are payable by the Plan Administrator until the earlier of the date that such undeliverable distributions are claimed by such holder and the date ninety (90) days after the date the undeliverable distributions were made. Following the expiration of ninety (90) days after the date the undeliverable distributions were made, the amounts in respect of undeliverable distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan. Such holder shall be deemed to have forfeited its right to any reserved and future distributions under the Plan, and the Claims of such holder shall be forever barred.

(f)     *Forfeiture of Distributions.* If the holder of a Claim fails to cash a check payable to it within the time period set forth in Section 11.4(h) hereof, fails to claim an undeliverable Distribution within ninety (90) days after issuance thereof, or fails to complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9 within ninety (90) days of the request by the Plan Administrator for the completion and return to him of the appropriate form, then such holder shall be deemed to have forfeited its right to any reserved and future distributions under the Plan, and the Claims of such holder shall be forever barred. The forfeited distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan.

(g)     *Further Distributions Not Feasible.* Notwithstanding anything to the contrary in the Plan, if the Plan Administrator determines that any holders of Claims no longer exist or cannot otherwise be reasonably ascertained, or the Plan Administrator determines that the Available Cash is insufficient to make any further distribution economically justifiable, the Plan Administrator, in his sole discretion, may donate such remaining Available Cash to a charity.

(h)     *Manner of Payment Pursuant to the Plan.* Any payment in Cash to be made pursuant to the Plan shall be made, at the election of the Plan Administrator, by check, wire transfer or such other method as the Plan Administrator deems appropriate under the circumstances. Payments to

foreign creditors may be made, at the option, and in the sole discretion, of the Plan Administrator, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. For purposes of effectuating distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. dollars pursuant to the applicable published exchange rate in effect on the Petition Date. Cash payments in the form of checks issued by the Plan Administrator shall be null and void if not cashed within ninety (90) days of the date of the issuance thereof and shall be deemed undeliverable distributions.

### 11.5.  Compliance with Tax Requirements; Allocations.

In connection with the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. The Plan Administrator may require, in his sole and absolute discretion and as a condition to the receipt of any distribution, that the holder of an Allowed Claim complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9, as applicable to each holder. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution, and including, in the case of any holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Reorganized Debtor in connection with such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements reasonably satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Reorganized Debtor in connection with such distribution.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 11.6.  Setoff.

The Plan Administrator may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the holder of such Claim; *provided* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtors may have against such holder.

### 11.7.  Claims Paid or Payable by Third Parties; Recourse to Collateral.

The Plan Administrator shall be authorized to reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or

action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, including on account of recourse to collateral held by third parties that secure such Claim. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent a holder of a Claim receives a distribution on account of a Claim and receives payment from a party that is not a Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## XII    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS

### 12.1.  Resolution of Disputed Claims.

(a)    *Allowance of Claims and Interests.* The Reorganized Debtor shall have and shall retain, and the Plan Administrator shall succeed to and be entitled to assert, any and all rights and defenses with respect to any Claim or Interest, except with respect to any Claim or Interest deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim. Notwithstanding anything to the contrary herein, if a timely objection to a proof of Claim has not been Filed or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

(b)    *Prosecution of Objections to Claims and Interests.*

The Plan Administrator shall have the exclusive authority to File objections to Claims or Interests, and the exclusive authority to settle, compromise, withdraw, or litigate to judgment

objections on behalf of the Debtors' Estates to any and all Claims or Interests, regardless of whether such Claims or Interests are in a Class or otherwise. From and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     *Claims Estimation.* On and after the Effective Date, the Plan Administrator may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Plan Administrator may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(d)     *Expungement or Adjustment to Claims Without Objections.* Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Plan Administrator, and any Claim that has been amended may be adjusted thereon by the Plan Administrator or the without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(e)     *Deadline to File Objections to Claims or Interests.* Any objections to Claims or Interests shall be Filed no later than the Claims Objection Bar Date.

(f)     *No Distributions Pending Allowance.* If an objection to a Claim or portion thereof is Filed as set forth herein, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

(g)     *Distributions After Allowance.* To the extent that a Disputed Claim ultimately becomes an

Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

### 12.2.  Disallowance of Claims.

To the maximum extent provided by section 502(d) of the Bankruptcy Code, all Claims of any Entity from which property is recoverable by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Plan Administrator alleges is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Plan Administrator, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

Any Claim which was filed in an unliquidated, undetermined, or nominal ($1.00 or $0.00) amount shall be disallowed, without further action of the Plan Administrator o Court, if the claimant thereof has not within 90 days after the Effective Date amended such Claim to a definitive amount or sought by motion to the Court (including but not limited with the agreement of the Plan Administrator) means to determine the definitive amount of the Claim.

### 12.3.  Amendments to Claims.

After 90 days following the Effective Date, any amendment to a Claim that increases the amount or elevates the priority of such Claim shall be without force or effect absent further order of the Court.

### 12.4.  Single Satisfaction of Claims.

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus any interest provided for under the Plan.

## XIII    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

Nothing in this Article of the Plan shall prohibit the holder of a Claim from litigating its right to seek to have such Claim declared an Allowed Claim and be paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the enforcement by the holder of a Claim of any of the obligations of the Reorganized Debtor under the Plan. The exculpations, releases and injunctions set forth herein shall be effective upon the Effective Date.

### 13.1.  Compromise and Settlement of Claims, Interests, and Controversies.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan, as well as a finding by the Bankruptcy Court that any compromise or settlement contemplated herein and agreed to by the parties to such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.

### 13.2.  Term of Injunctions or Stays.

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 13.3.  Exculpation; Limitation of Liability.

**Notwithstanding any other provision of the Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission taking place on or after the Petition Date through the Effective Date relating to, in any way, or arising from: (i) any act taken or omitted to be taken from and including the Petition Date through the Effective Date in connection with the Chapter 11 Cases; (ii) formulating, negotiating, filing or implementing the Combined Plan and Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement; (iii) any other act taken or omitted to be taken from and including the Petition Date through the Effective Date in connection with or in contemplation of the restructuring or liquidation of the Debtors; (iv) the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan; (v) the administration of the Plan or the property to be distributed under the Plan; or (vi) the administration, winding up and dissolution of the Reorganized Debtor, except for their bad faith, gross negligence, fraud or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or Cause of Action against the Exculpated Parties that has been exculpated pursuant to the Plan.**

### 13.4.  Mutual Releases by the Released Parties.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Released Parties shall be deemed to forever release, waive and discharge the other Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever in connection with or related to the Debtors, their operations, their assets, their Estates, the Chapter 11 Cases, or the Combined Plan and**

41

Disclosure Statement, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date (other than the rights to enforce rights and obligations under the Confirmation Order and the Plan); *provided* that nothing in this section shall operate as a release, waiver or discharge of any (i) Professional Fee Claims or (ii) Causes of Action or liabilities arising out of bad faith, gross negligence, fraud or willful misconduct as determined by a Final Order.

   **13.5.  Injunction.**

(a)  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Consistent with the preceding sentence, except as otherwise expressly provided in the Plan, the Plan Supplement, related documents, or for obligations iss ued pursuant to the Plan, all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to the Plan or as to which the Plan provides for classification and treatment or that are subject to the exculpatory provisions herein, are permanently enjoined from taking any of the following actions from and after the Effective Date:   (i) commencing or continuing in any manner any action or other proceeding of any kind  against the Debtors (but solely to the extent such action is brought against the Debtor to directly or indirectly recover upon any assets of the Estate, including, without limitation, any s uch assets that vest in the Reorganized Debtor, as applicable, upon the Effective Date), or the Reorganized Debtor on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors or the Reorganized Debtor on account of or in connection with or with respect to any such Claims or Interests; and (iii) creating, perfecting or enforcing any encumbrance of any kind against any Debtors or the property of the Estates or the Reorganized Debtor on account of in connection with or with respect to any such Claims or Interests.

(b)  Except as otherwise provided in this Plan, or to the extent necessary to enforce the terms and conditions of this Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Interests shall be permanently enjoined from taking any of the following actions against any of the assets of the Estates or the Reorganized Debtor or any other asset or to be distributed under the Plan on account of any such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action, cause of action, or other proceeding; (ii) enforc ing attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting or enforcing any lien; (iv) asserting a setoff (except to the extent such setoff was exercised prior to the Petition Date), or the right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) commencing or continuing, in any

manner or in any place, any action, cause of action, or other proceeding against any of the Estates or Reorganized Debtor's assets or any other assets to be distributed under this Plan that does not comply with or is inconsistent with the provisions of this Plan.

(c)  Nothing in this section shall prevent the Reorganized Debtor from monetizing the Non-Cash Assets or commencing any action or other proceeding of any kind against any party, other than against an Exculpated Party for any matter expressly covered by Section 13.3 herein; provided that, for the avoidance of doubt, nothing herein authorizes, and the Debtors, Reorganized Debtor, and Plan Administrator shall not seek to monetize the corporate shell of JER Investors Trust Inc.

(d)  Notwithstanding the foregoing clauses, all Entities shall be enjoined from commencing or continuing in any manner any action or other proceeding of any kind against an Exculpated Party for any matter expressly covered by Section 13.3 herein.

(e)  The injunction provisions contained in this Plan and the Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action. Accordingly, notwithstanding anything contained in this Plan or the Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; or (3) any valid right of setoff or recoupment of any Governmental Unit against either of the Debtors. Nor shall anything in this Plan or the Confirmation Order: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are barred by this Plan, the Confirmation Order, or the Bankruptcy Code.  Moreover, nothing in the Confirmation Order or the Plan shall release any non-Debtor from any liability to any Governmental Unit.

## XIV    SUBSTANTIAL CONSUMMATION OF THE PLAN

### 14.1.  Conditions Precedent to Consummation of the Plan.

It shall be a condition to Consummation of the Plan that the following conditions have been satisfied or waived:

1. the Bankruptcy Court shall have entered the Confirmation Order, in form and substance materially consistent with the Plan in all respects, and the Confirmation Order shall have become a Final Order with no stay thereof in effect;

2. the Professional Fee Escrow shall have been established and funded; and

3. there shall exist sufficient Available Cash to satisfy Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims that are Allowed Claims or reasonably anticipated to become Allowed Claims.

### 14.2.  Waiver of Conditions.

The condition to Consummation of the Plan set forth in Section 14.1 hereof that the Confirmation Order shall have become a Final Order may be waived by the Debtors at any time without notice or authorization of the Bankruptcy Court, whereupon, subject to the satisfaction of the remaining conditions set forth in Section 14.1 hereof, the Debtors may cause the Effective Date to occur without further action by any Entity.

### 14.3.  Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### 14.4.  Effect of Non-Occurrence of Conditions to the Effective Date.

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any holders, or any other Entity in any respect.

## XV    MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### 15.1.  Modification and Amendments.

The Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors one or more times, after Confirmation but before the Effective Date, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XV hereof.

### 15.2.  Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 15.3.  Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors

revoke or withdraw the Plan with respect to any Debtor, then: (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such Debtor shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## XVI   RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Combined Plan and Disclosure Statement are carried out. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising in, arising out of, or related to, the Chapter 11 Cases, and all matters arising under or related to the Plan.

## XVII   MISCELLANEOUS PROVISIONS

### 17.1.  Immediate Binding Effect.

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Debtors' Estates, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

### 17.2.  Additional Documents.

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 17.3.  Reservation of Rights.

Neither the Plan, any statement or provision contained in the Plan, nor any action taken or

not taken by the Debtors or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

### 17.4. Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 17.5. Service of Documents.

Any pleading, notice, or other document required by the Plan to be served on or delivered to the following entities and shall be served via first class mail, overnight delivery, or messenger on:

| | |
|---|---|
| **If to the Debtors or Plan Administrator:** | *Prior to the Effective Date:*<br>Matthew Dundon, Chief Restructuring Officer<br>Ten Bank Street, Suite 1100<br>White Plains, NY 10606<br>md@dundon.com<br><br>*Subsequent to the Effective Date:*<br>Matthew Dundon, Plan Administrator<br>Ten Bank Street, Suite 1100<br>White Plains, NY 10606<br>md@dundon.com |

**With copies to:**                                    David M. Fournier
                                                       Kenneth A. Listwak
                                                       Tori L. Remington
                                                       **TROUTMAN PEPPER HAMILTON SANDERS LLP**
                                                       Hercules Plaza, Suite 5100
                                                       1313 N. Market Street, Suite 5100
                                                       Wilmington, DE 19801
                                                       Email: david.fournier@troutman.com
                                                               kenneth.listwak@troutman.com
                                                               tori.remington@troutman.com

                                                       -and-

                                                       Deborah Kovsky-Apap
                                                       **TROUTMAN PEPPER HAMILTON SANDERS LLP**
                                                       875 Third Avenue
                                                       New York, NY 10022
                                                       Email: deborah.kovsky@troutman.com

                                                       -and-

                                                       April Kimm, Esq.
                                                       Dundon Advisers LLC
                                                       Ten Bank Street, Suite 1100
                                                       White Plains, NY 10606
                                                       ak@dundon.com

### 17.6.  Entire Agreement.

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 17.7.  Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, provided that at the request of the Debtors (in their sole discretion), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors. The Confirmation Order shall constitute a judicial

determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

### 17.8. Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

### 17.9. Waiver or Estoppel.

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.


Dated: March 28, 2024                      JER INVESTORS TRUST INC.
                                           JERIT NON-CDO CMBS 1 LLC


                                           */s/ Matthew J. Dundon*
                                           _____
                                           Matthew J. Dundon, Chief Restructuring Officer

# Exhibit A

**Liquidation Analysis**

**JER Investors Trust Inc.**
Liquidation Analysis

*($ in thousands)*

|  | Ch. 11 | Ch. 7 |
|---|---|---|
|  | Mid | Mid |
| **ASSETS** | | |
| Equity in JNCDO [(1)] | $21,683 | $21,683 |
| NOLs [(2)] | $0 | $0 |
| ***Total Assets*** | **$21,683** | **$21,683** |
| **LIABILITIES** | | |
| **Bankruptcy Administrative Expenses** | | |
| Chapter 7 Trustee Fees | $0 | $610 |
| Debtor Wind-Down (Non-Profesionals) | $88 | $100 |
| Professional Expenses [(3)] | $600 | $750 |
| United States Trustee Fees | $175 | $175 |
| ***Total*** | **$862** | **$1,635** |
| ***Recovery*** | **$862** | **$1,635** |
| *Recovery %* | *100.00%* | *100.00%* |
| **Other Administrative Expenses** | | |
| None* | $0 | $0 |
| **Priority Claims** | | |
| None* | $0 | $0 |
| **General Unsecured Claims\*** | | |
| C-III Manager Termination Fee Settlement | $10,000 | $15,000 |
| C-III Capital Partners - REIT Adviser Payable | $4,790 | $4,790 |
| Junior Subordinated Notes [(4)] | $93,878 | $93,878 |
| Additional C-III JERIT Manager Claims | $0 | $3,455 |
| ***Total*** | **$108,668** | **$117,123** |
| ***Recovery*** | **$20,821** | **$20,048** |
| *Recovery %* | *19.16%* | *17.12%* |
| **Remaining Funds** | **$0** | **$0** |
| **Subordinated Claims\*** | | |
| C-III Settlement (Subordinated Portion) | $5,000 | $0 |
| **Equity Interests** | | |
| JERIT Common Equity Interests | $0 | $0 |

*(1) Consists solely of JNCDO's cash on hand.*
*(2) Net book value is without any consideration for useability. The Debtors currently do not anticipate any cash to be realized from their NOLs.*
*(3) Excludes amounts paid pre-petition, net of application of retainers; low recoveries contemplate creditor expenses (e.g., an Official Committee of Unsecured Creditors) becoming chargeable to the Estates.*
*(4) No debt is outstanding to which the "Junior Subordinated Notes" are by the terms of their indenture subordinated, so they recover together with the C-III Settlement Agreement and C-III Capital Partners NAB Claim.*
*(5) C-III Manager may have colorable claims for unpaid overhead reimbursement under the Management Agreement, and the Debtors may have defenses to some or all of such claims. C-III Manager has agreed to waive such claims under the C-III Settlement Agreement.*
*\* These are subject to change in the event that unanticipated claims are filed on or before the applicable bar date.*

**JER Investors Trust Inc.**
Liquidation Analysis

($ in thousands)

| ASSETS | Net Book Value (As of Dec. 29, 2023) | Realized Value % Ch. 11 Low | % Ch. 11 High | % Ch. 7 Low | % Ch. 7 High | $ Ch. 11 Low | $ Ch. 11 High | $ Ch. 7 Low | $ Ch. 7 High |
|---|---|---|---|---|---|---|---|---|---|
| Equity in JNCDO [1] | $21,683 | 100.0% | 100.0% | 100.0% | 100.0% | $21,683 | $21,683 | $21,683 | $21,683 |
| NOLs [2] | $1,018,872 | 0.0% | 0.0% | 0.0% | 0.0% | $0 | $0 | $0 | $0 |
| **Total Assets** | **$1,040,555** | **2.1%** | **2.1%** | **2.1%** | **2.1%** | **$21,683** | **$21,683** | **$21,683** | **$21,683** |

| LIABILITIES | Estimated Allowed Claim Amount Ch. 11 Low | Ch. 11 High | Ch. 7 Low | Ch. 7 High | Claim Recovery $ Ch. 11 Low | $ Ch. 11 High | $ Ch. 7 Low | $ Ch. 7 High | % Ch. 11 Low | % Ch. 11 High | % Ch. 7 Low | % Ch. 7 High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bankruptcy Administrative Expenses** | | | | | | | | | | | | |
| Chapter 7 Trustee Fees | -- | -- | $674 | $539 | $0 | $0 | $674 | $539 | N/A | N/A | 100.00% | 80.00% |
| Debtor Wind-Down (Non-Profesionals) | $100 | $75 | $125 | $75 | $100 | $75 | $125 | $75 | 100.00% | 100.00% | 100.00% | 100.00% |
| Professional Expenses [3] | $900 | $300 | $1,000 | $500 | $900 | $300 | $1,000 | $500 | 100.00% | 100.00% | 100.00% | 100.00% |
| United States Trustee Fees | $173 | $173 | $173 | $173 | $173 | $173 | $173 | $173 | 100.00% | 100.00% | 100.00% | 100.00% |
| *Total* | | | | | **$1,173** | **$548** | **$1,972** | **$1,287** | | | | |
| **Other Administrative Expenses** | | | | | | | | | | | | |
| None* | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Priority Claims** | | | | | | | | | | | | |
| None* | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **General Unsecured Claims*** | | | | | | | | | | | | |
| C-III Manager Termination Fee Settlement | $10,000 | $10,000 | $15,000 | $15,000 | $1,887 | $1,945 | $2,524 | $2,612 | 18.87% | 19.45% | 16.83% | 17.41% |
| C-III Capital Partners - REIT Adviser Payable | $4,790 | $4,790 | $4,790 | $4,790 | $904 | $932 | $806 | $834 | 18.87% | 19.45% | 16.83% | 17.41% |
| Junior Subordinated Notes [4] | $93,878 | $93,878 | $93,878 | $93,878 | $17,718 | $18,258 | $15,799 | $16,348 | 18.87% | 19.45% | 16.83% | 17.41% |
| Additional C-III JERIT Manager Claims | -- | -- | $3,455 | $3,455 | $0 | $0 | $581 | $602 | N/A | N/A | 16.83% | 17.41% |
| *Total* | | | | | **$20,509** | **$21,134** | **$19,711** | **$20,395** | | | | |
| **Subordinated Claims*** | | | | | | | | | | | | |
| C-III Settlement (Subordinated Portion) | $5,000 | $5,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Equity Interests** | | | | | | | | | | | | |
| JERIT Common Equity Interests | N/A | N/A | N/A | N/A | -- | -- | -- | -- | N/A | N/A | N/A | N/A |

(1) Consists solely of JNCDO's cash on hand.
(2) Net book value is without any consideration for useability. The Debtors currently do not anticipate any cash to be realized from their NOLs.
(3) Excludes amounts paid pre-petition, net of application of retainers; low recoveries contemplate creditor expenses (e.g., an Official Committee of Unsecured Creditors) becoming chargeable to the Estates.
(4) No debt is outstanding to which the "Junior Subordinated Notes" are by the terms of their indenture subordinated, so they recover together with the C-III Settlement Agreement and C-III Capital Partners NAB Claim.
(5) C-III Manager may have colorable claims for unpaid overhead reimbursement under the Management Agreement, and the Debtors may have defenses to some or all of such claims.
   C-III Manager has agreed to waive such claims under the C-III Settlement Agreement.
* These are subject to change in the event that unanticipated claims are filed on or before the applicable bar date.